IN RE APPLICATION TO HAVE DAVID PETERSEN
ADJUDGED MENTALLY ILL. DAVID PETERSEN, APPELLANT,
v. COUNTY BOARD OF MENTAL HEALTH, DOUGLAS
COUNTY, NEBRASKA, APPELLEE.

279 N. W. 2d 844

Filed June 5, 1979. No. 42212.

Thomas M. Kenney, Douglas County Public Defender, and Bennett G. Hornstein, for appellant.

Donald L. Knowles, Douglas County Attorney, and Jerry L. Stejskal, for appellee.

Heard before KRIVOSHA, C. J., WHITE, and HASTINGS, JJ., and REIMER and HIPPE, District Judges.

HASTINGS, J.

Although docketed separately, by agreement of the parties this case was consolidated for argument with Hill v. County Board of Mental Health, *ante* p. 610, 279 N. W. 2d 838 (1979), and is controlled by that case. David Petersen has appealed from an order of the District Court for Douglas County affirming the action of the Douglas County board of mental health finding him to be a mentally ill dangerous person in need of board-ordered treatment. Error is assigned in that it is claimed the evidence was insufficient as a matter of law to establish these findings by clear and convincing proof.

The hearing before the mental health board was

held on April 14, 1978, and Petersen was represented by counsel. Dr. David K. Kentsmith, a psychiatrist, testified he had examined Petersen on April 11, 1978, and found him to have a major mental disorder. It was diagnosed as schizophrenia, classified as paranoid. He defined this as a mental illness. At the present time the witness found no suicidal ideation or significant depression present in Petersen. The findings of Dr. Kentsmith were neither attacked nor refuted and it can be said that there is clear and convincing proof that Petersen is a mentally ill person. However, the critical question is whether because of that illness, by clear and convincing proof, he presents a substantial risk of serious harm to another person or to himself as manifested by evidence of recent violent acts or threats or "of inability to provide for his basic human needs, including food, clothing, shelter, essential medical care, or personal safety." § 83-1009, R. S. Supp., 1978.

There was evidence of a violently vocal argument between Petersen and his married sister, Linda Kneifel, which occurred on March 17, 1978. Mrs. Kneifel had stopped at Petersen's house to give him a ride. As she ran up to her brother's room to get him, one of her children, a 3½-year-old left in the car, began honking the horn. Upon returning to the car, she spanked the errant child which greatly upset Petersen. He explained in no uncertain terms that spanking does no good and that she should have taken the child in her arms until he calmed down. He said she should show more love and that wasn't showing love. Mrs. Kneifel told Petersen to mind his own business and that she was the child's mother and would discipline her children as she saw fit. The sister said both of them yelled at each other and then things finally calmed down.

Later in the day, after Mrs. Kneifel had picked up Petersen and their mother, they were all in the car running some errands. The mother started remon-

strating Petersen, who was 29 years old at the time, about spending or giving his money away. About this time Mrs. Kneifel said something to Petersen about the fact that his ex-wife, from whom he was divorced some 5 months earlier, has "probably got a honey by now." In her words, Petersen "just went berserk," yelling at her that she had been following his ex-wife around and she had no right to do so. She finally asked him to leave the car which he did and, in her words, Petersen said in leaving, "Sleep on it or something and you'll be begging me — you'll be calling me, begging me, something, and he was yelling l-o-v-e, love, love. It ended on kind of a sour note. And that was about it." The witness admitted that the yelling didn't bother her driving because "I'm used to yelling in the car because my kids fight in the back seat and do things like that. I just have to kind of block that out."

On further questioning by the county attorney, Mrs. Kneifel gave the following testimony: "Q. Do you remember telling me you were scared? A. Oh, yes. * * * Q. Could you tell the Board what you were scared of? He wasn't threatening you or anything? A. I don't like to be around my brother when he's angry. I don't like to be around anyone when they're yelling and angry, because I think things - - - Q. When you say on this particular occasion you were scared something in particular would happen, like maybe he might hit your boy? A. No, I was not afraid he would hit my boy. * * * Mr. Fahey: He wants to know if you were afraid for yourself. * * * A. I did not know, but I did not want to get that far. That's why I kept asking him to get out of my car. * * * Q. In that regard, have there been any recent occasions in the past where he may have attempted to do something like that to support your belief? A. No. I have — we've never had any occasion where I felt he was going to hit me."

Mrs. LaVonne Petersen, the mother, testified as to the argument just mentioned. She said the two of them were shouting at each other and she was scared too. When asked what she was scared of, she said, "The way he was yelling." She said that "I thought if the argument would have kept on, he would have harmed Linda. That was the first time I've seen him so upset. Really upset. And Christmas time he was very upset." Upon being asked what happened after Petersen got out of the car, the witness said, "He was just shouting crazy words at Linda." When asked what the words were, she answered, "love."

It would be pure speculation to assume that the incidents just related approach the level of "evidence of recent violent acts or threats of violence or by placing others in reasonable fear of such harm;" as required by section 83-1009, R. S. Supp., 1978. As a matter of fact, the chairman of the mental health board sustained Petersen's motion to dismiss that part of the petition for commitment alleging that he was dangerous to himself or others. In announcing the final findings, the chairman stated: "After deliberation, I think the Board is in agreement as to the patient's inability to provide for his basic human needs. Specifically, the patient's consistence [sic] of giving away his money and then having to depend on his family to shore up his needs. We also will find clear and convincing evidence of mental illness and dangerousness — excuse me, mental illness based on the findings and diagnosis of Dr. Kentsmith. I might add that there was a tremendous amount of concern as to the conduct of the patient in confrontation on that particular date that Mrs. Kneifel testified to. I think it bears mentioning. Two of the Board members felt there was enough to find evidence of the risk of serious harm in both of those cases. Because of the fear that he put his mother

and his sister in on that occasion."

Although apparently the board did not find Petersen to be a "mentally ill dangerous person" as to another person, in spite of the recitation that two of the three board members had such feeling, this is perhaps a good place to mention a proposition of law cited by appellant in this case as well as in Hill v. County Board of Mental Health, *ante* p. 610, 279 N. W. 2d 838; and Jones v. County Board of Mental Health, *ante* p. 618, 279 N. W. 2d 841, although the same was argued but not assigned as error. That has to do with the failure of the board to make written statements as to the evidence relied upon in finding clear and convincing proof that a subject is a "mentally ill dangerous person" as required by section 83-1060, R. R. S. 1943. Such written statements should, as a matter of course, be made in each case.

The remainder of the hearing and the evidence upon which the board based its findings of the necessity of commitment had to do with his generosity, or more appropriately his spendthriftiness, resulting from what Dr. Kentsmith termed "delusions of grandeur and excessive religiosity."

According to Dr. Kentsmith, from information given him by Petersen himself, Petersen receives approximately $400 per month in social security mental disability payments and gives away $200 of those payments to anyone who happens to be walking along and needs it. He also gives them a cross and says he does this because he has read a sign in the church that says to give to the poor. He admitted sometimes toward the end of the month he runs out of money, has no groceries, and has to ask his mother for money, which upsets her. The mother corroborated this evidence by testifying she knows her son gets $462 per month because she has cashed checks for him. After acknowledging she was aware of the fact that he had been giving away some of his money, when she was asked how many such

instances she knew of, she replied: "I've really noticed it in the last month, when he comes to me, called me and didn't have any money." She went on to say that she took groceries over and filled up his cupboard just the last month. Apparently, according to her further testimony, both she and her husband have had to give him money in the past several months. Petersen's explanation to her was "that he has to give it away to the poor people. He can't stand to see poor people." Mrs. Petersen went on to say that her son had lost some weight, maybe 10 or 15 pounds. "I really think that his nerves were getting him down and he wasn't eating right, because when he's upset he won't eat." She also testified she was afraid for her son's safety because he would pick people up off the street and bring them home and feed them.

As previously stated, there is no question but what David Petersen is a mentally ill person, and, by the same token, there is no clear and convincing proof that he presents a substantial risk of serious harm to another as manifested by evidence of any recent violent acts or threats, and both the board and the District Court so found. There is also no question but what he is spendthrifty and improvident. However, this is not equivalent to being a "dangerous person * * * who presents * * * a substantial risk of serious harm to himself * * * as manifested by * * * evidence of inability to provide for his basic human needs, including food, clothing, shelter, essential medical care, or personal safety." § 83-1009, R. S. Supp., 1978. "The disposition ordered by the mental health board shall represent the alternative which imposes the least restraint upon the liberty of the subject required to successfully treat the particular mental illness and prevent the particular harm which was the basis for the board's finding the person to be a mentally ill dangerous person * * *." § 83-

1038, R. R. S. 1943. The treatment for improvidence lies in conservatorship or guardianship proceedings, not mental health commitment.

The order of the mental health board was not supported by clear and convincing proof, and as a matter of law, the evidence was such that the District Court should have made such a finding.

The order of the District Court is reversed and the cause is remanded with orders to dismiss the petition.

REVERSED AND REMANDED WITH INSTRUCTIONS.